IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| ASHLEY D., | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00050 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:  Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Ashley D. asks this Court to review the Commissioner of Social Security's final

decision denying her claims for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–

1383f, after a prior federal-court remand under the fourth sentence of 42 U.S.C. § 405(g). *See*

Compl., ECF No. 2. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having

considered the administrative record, the parties' briefs, and the applicable law, I find that the

denial of benefits is supported by substantial evidence.[1] Accordingly, I respectfully recommend

the presiding District Judge affirm the Commissioner's final decision under 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it

may not "reweigh conflicting evidence, make credibility determinations, or substitute [its]

judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).

Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the

---

[1] Ashley's request for oral argument, Pl.'s Br. 18, ECF No. 12, is denied because a hearing would not aid
in the decisional process. *See* W.D. Va. Gen. R. 4(c)(2).

Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1383c(a)(3)(B); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence,

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the written decision subject to judicial review under 42 U.S.C. § 405.

whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Ashley filed for DIB and SSI in March 2018. *See* Administrative Record ("R.") 210–11, ECF No. 10. She alleged that she had been disabled since June 1, 2016, because of bipolar disorder, depression, anxiety, attention deficit hyperactivity disorder ("ADHD"), and learning disability. *See* R. 258. Ashley was twenty-three years old, or a "younger person" under the regulations, on her alleged onset date. *See* R. 95, 255; 20 C.F.R. §§ 404.1563(c), 416.963(c).

Disability Determination Services ("DDS"), the state agency, denied Ashley's claims initially in September 2018, R. 95–115, and upon reconsideration in April 2019, R. 117–49. In February 2020, Ashley appeared with counsel and testified by telephone at an administrative hearing before ALJ Theodore Kennedy. R. 60–93. ALJ Kennedy issued an unfavorable decision on February 24, 2020. R. 41–54. After the Appeals Council ("AC") declined to review that decision, R. 1–2, Ashley filed suit in the United States District Court for the Eastern District of Virginia. *See* R. 1407. At the Commissioner's request, that court remanded Ashley's claims to the agency under the fourth sentence of 42 U.S.C. § 405(g). *See* R. 1411–12; Def.'s Br. 2, ECF No. 19. In November 2021, the AC vacated ALJ Kennedy's decision and instructed an ALJ to

reevaluate Ashley's mental residual functional capacity ("RFC"), "including [by] explaining limitations related to [her] ability to concentrate, persist[,] and maintain sustained pace," R. 1412. *See* R. 1411.

In April 2022, Ashley appeared with counsel and testified by telephone at a second administrative hearing before ALJ Raquel BaileySmith. *See* R. 1339–63. A vocational expert ("VE") also testified. R. 1363–67. ALJ BaileySmith issued an unfavorable decision on June 6, 2022. *See* R. 1310–34. At step two, she found that Ashley had the following "severe" medically determinable impairments ("MDI") during the relevant time: "depression, anxiety, personality disorder, and neurocognitive disorder." R. 1310. None of those MDIs, alone or combined, met or medically equaled a relevant Listing. R. 1311–13 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.02, 12.04. 12.06, 12.08)).[3] As part of her Listings analysis, the ALJ found that Ashley had "a moderate limitation" in her overall capacities for understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. *See generally id.* (citing R. 273–80 (Ex. 4E); R. 1099–1102 (Ex. 7F); R. 1349–60 (April 2022 hearing testimony)).

Next, the ALJ evaluated Ashley's RFC based on relevant medical and nonmedical evidence created between August 2016 and April 2022. *See* R. 1314–22. She found that Ashley

---

[3] These Listings set out the criteria for presumptively disabling neurocognitive disorders (12.02); depressive, bipolar, and related disorders (12.04); anxiety and obsessive-compulsive disorders (12.06); and personality and impulse-control disorders (12.08). *See generally* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.02, 12.04. 12.06, 12.08 (2022). Each Listing requires medical evidence of the underlying disorder plus evidence that the disorder causes "extreme limitation [in] one, or marked limitation [in] two," of four broad areas of work-related mental functioning. *See id.* § 12.00(A)(2)(b). These functional areas address the claimant's overall capacity to: "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.* Ashley's arguments on appeal focus on the ALJ's mental RFC assessment, *see* Pl.'s Br. 11–18, which always comes after the Listings analysis. *See* 20 C.F.R. §§ 404.1520a(d)(3)–(4), 416.920a(d)(3)–(4); *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659, 661–62 (4th Cir. 2017); *Samantha D. v. Kijakazi*, No. 5:21cv69, 2022 WL 17986690, at *3–4 & n.7 (W.D. Va. Dec. 29, 2022). She does not argue that her mental MDIs met or equaled a relevant Listing. *See generally* Pl.'s Br. 11–18.

could work at all exertional levels, R. 1313, but that "significant mental health issues," R. 1320, further limited her to: understanding, remembering, and carrying out "simple[,] routine[,] repetitive tasks for two hours at a time with normal breaks"; concentrating, persisting, and maintaining "pace to complete goal oriented, simple tasks that do not require production rate pace[,] meaning fast pace"; having only "occasional contact with coworkers[,] but none with the public in settings where tasks involve work primarily with objects rather than people"; and dealing with only "occasional changes associated with simple, routine, repetitive work." R. 1314. The ALJ based most of these specific restrictions, which she characterized as reflecting "no more than moderate limitations" on Ashley's ability to sustain unskilled work activities in a competitive workplace, R. 1317, 1319, on a medical opinion from Andrew Bockner, M.D., the DDS physician who reviewed Ashley's records in April 2019, R. 1319 (citing R. 124–25, 127–28, 139–40, 142–43). She rejected medical opinions from other sources indicating that Ashley had "marked to extreme limitations in all [mental] functional areas," R. 1319 (citing R. 1329), and would miss at least two days of work each month, *see* R. 1317–19 (citing R. 957, 1102, 1239). *See also* R. 1321 (citing R. 1365).

    The ALJ's RFC finding ruled out Ashley returning to her past work as a warehouse worker, spa attendant, and greeter. R. 1322 (citing R. 1362–64). Based on the VE's testimony, however, the ALJ found that Ashley's RFC and vocational profile would have allowed her to do certain "unskilled"[4] medium-exertion occupations (lumber sorter, linen room attendant, laundry

---

[4] "'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56847, at *4 (Jan. 1, 1985).

marker/sorter) existing in the national economy. R. 1323 (citing R. 1363–64). Accordingly, the ALJ concluded that Ashley had "not been under a disability, as defined in the Social Security Act, from June 1, 2016, through the date of this [ALJ's] decision." R. 1324. This ALJ's June 6, 2022, hearing decision is the Commissioner's final decision denying Ashley's DIB and SSI claims after a prior federal-court remand. *See* 20 C.F.R. §§ 404.984(d), 416.1484(d).

## III. Discussion

Ashley challenges the Commissioner's denial of benefits on three grounds, each of which relates to the ALJ's mental RFC determination. *See generally* Pl.'s Br. 11–12 (failure to consider closed period of disability based on frequency of psychiatric hospitalizations and emergency room visits from July 28, 2019, to August 10, 2020), 13–15 (perceived conflict between ALJ's mental RFC finding and Dr. Bockner's medical opinion identifying "moderate" limitations within certain work-related mental activities), 15–17 (challenging ALJ's medical-opinion analysis generally). Her arguments are not persuasive.

### A.    *The Legal Framework*

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her MDIs and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms," including the effects of treatment, that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2, *5. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). Generally, a reviewing court will

affirm the ALJ's RFC findings and conclusions when it is clear that she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and her written decision builds an "accurate and logical bridge from that evidence to [her] conclusion," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (cleaned up).

B.    *Analysis*

    1.    *Closed Period of Disability*

Ashley's first argument focuses on what is called a "closed period" of disability. *See* Pl.'s Br. 11–12. The relevant period for an ALJ's disability determination typically runs from the claimant's alleged disability onset date through the date of the administrative hearing. *See Sykes v. Comm'r, Soc. Sec.*, Civ. No. ELH-16-898, 2017 WL 35436, at *2 (D. Md. Jan. 4, 2017). To qualify for disability, the claimant must show that her severe MDI(s) and related symptoms or treatment prevented her from working on a regular and continuing basis for any 12 consecutive months between those two dates. *See Salters v. Saul*, Civ. No. 6:19-721, 2020 WL 1933782, at *1 (D.S.C. Apr. 22, 2020). A claimant who makes this showing "may be eligible for a closed period of disability benefits," *id.* (citing *Shiplett v. Colvin*, No. 5:15cv55, 2016 WL 6783270, at *13 (W.D. Va. Nov. 16, 2016)), even if she was not disabled at the hearing, *Shiplett*, 2016 WL 6783270, at *13. Thus, an ALJ's failure "to consider whether a closed period of disability existed" during the relevant time may warrant reversing a denial of benefits and remanding the plaintiff's claims for rehearing. *Sykes*, 2017 WL 35436, at *2; *see* 42 U.S.C. § 405(g). The plaintiff bears the burden to explain why the ALJ's error "might have changed the outcome of his [or her] disability claim." *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

ALJ BaileySmith's conclusion that Ashley "ha[d] not been under a disability, as defined in the Social Security Act, from June 1, 2016, through the date" she issued her decision in June 2022, R. 1324, contains an implicit finding that Ashley failed to establish a closed period of disability. *See Ritchie v. Saul*, No. 1:19cv3302, 2021 WL 168443, at *3–4 (D. Md. Jan. 19, 2021). Ashley faults the ALJ for failing to explain why Ashley was not entitled to a closed period of disability for the 12½ months "from July 28, 2019 to August 10, 2020." Pl.'s Br. 11. She asserts that she "was psychiatrically hospitalized and/or in the ER due to suicidal ideation for twenty-six days," *id.* (citing R. 1207–14, 1224–31, 1266–1302, 1502–28, 1803–35, 2846–71, 2874–82), which "is an average of 2.08 days/month for that 12½ month time period." *Id.* Ashley claims that she "obviously would have been absent from work on those days," because "one cannot be present for employment while in an ER psychiatric ward or while being psychiatrically hospitalized." *Id.* at 12. "The VE testified that two or more absences per month [would] preclude all jobs in the national economy." *Id.* (citing R. 1365). Thus, Ashley argues that the ALJ was required to explain why Ashley's "well-documented ER psychiatric ward and psychiatric impairment hospitalization[s] during th[e] 12½ month period between July 28, 2019 to August 10, 2020," did not entitle her to a closed period of disability on grounds that she would have been absent from work at least two days each month. *See id.*

Notably, Ashley's attorney did not ask ALJ BaileySmith to consider whether she might be entitled to a closed period of disability. R. 1367–68; Def.'s Br. 20; *see Charlene L. v. Saul*, No. 3:19cv626, 2021 WL 725822, at *8–9 (E.D. Va. Feb. 3, 2021) (vacating denial of benefits and remanding claim where the ALJ's findings and analysis suggested he "may not have recognized that Plaintiff limited [her] application to a closed period of disability"), *adopted by* 2021 WL 725078 (E.D. Va. Feb. 24, 2021); *Smith v. Saul*, 3:18cv783, 2020 WL 430779, at *2

(E.D. Va. Jan. 28, 2020) ("Smith concedes that the regulations do not require an ALJ to analyze whether a claimant might be entitled to a closed period somewhere within an overall claim in every case." (cleaned up)); *Schaller v. Colvin*, No. 5:13cv334, 2014 WL 4537184, at *9 (E.D.N.C. Sept. 11, 2014) ("Claimant was represented by counsel, and the ALJ was allowed to presume that he presented his best case."). Nonetheless, the ALJ recognized that "the record refeclt[ed] multiple hospitalizations with suicidal ideation psychosis and substance abuse," R. 1320, and summarized some of the ER and inpatient treatment records that Ashley now cites to support her argument, R. 1316 (citing R. 1207 (Aug. 2019); R. 1266–1302 (Oct. 2019); R. 1502–28 (Mar.–Apr. 2020)).

As part of her RFC analysis, the ALJ found "multiple hospitalizations when [Ashley] stopped taking medication or was not in therapy" to manage her "significant mental health issues" related to "depression, bipolar disorder, anxiety, . . . panic attacks, paranoia, [and] isolation," R. 1320 (Even after sobriety, mental health symptoms were aggravated by family conflict and noncompliance with treatment and medication."). *See* R. 1316 (citing R. 1207, 1502–28). Conversely, Ashley's wide-ranging psychological "[s]ymptoms stabilized with therapy" and "improv[ed]" when she took her medications as prescribed. R. 1320; *see* R. 1315, 1320 (listing symptoms); R. 1316–17 (citing R. 1704–12 (Apr. 2021)). Other progress notes indicated that her "self-care and domestic skills were intact and unimpaired despite irregular compliance with medi[c]ations." R. 1320 (citing R. 1035 (July 2018), 1264 (Mar. 2019)). The ALJ also rejected a medical opinion from Geranameo Bullock, M.D., that Ashley "would be absent from work more than four days per month," R. 1318 (citing R. 1239 (Dec. 2019)), in part because "Dr. Bullock did not account for [Ashley's] pattern of noncompliance." *Id.*; *see* R. 1316 (citing R. 1035, 1095, 1207, 1264, 1508–28). On this record, the ALJ reasonably concluded that

Ashley's repeated failure to follow outpatient mental-health treatment, as well as her positive response to psychotropic medications and therapy, were inconsistent with Ashley's claim that her mental MDIs were disabling. *See Roddy v. Kijakazi*, No. 4:21cv3553, 2022 WL 855519, at *5–9 (D.S.C. Mar. 23, 2023); *accord Barbare v. Saul*, 816 F. App'x 828, 834 (4th Cir. 2020) ("It goes without saying that 'if a symptom can be reasonably controlled by medication or treatment, it is not disabling.'" (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (brackets omitted)). Ashley does not challenge the ALJ's findings and conclusions on these points. *See* Pl.'s Br. 11–12, 16–17.

Moreover, the additional treatment records that Ashley cites to support her argument that ALJ BaileySmith should have explained whether she was disabled from July 2019 through August 2020 only lend further support to the ALJ's implicit conclusion that Ashley failed to make that showing. *See Ritchie*, 2021 WL 168443, at *3–4. On July 27, 2019, for example, she told an ER nurse that she had "taken meds for depression in [the] past but isn't taking anything right now" and it had been nine months since she saw her therapist and psychiatrist. R. 1224; *accord* R. 1207 (Aug. 2019). Ashley stayed at the ER for about two hours that evening. R. 1224. She denied "any suicidal thoughts" at discharge and left with scheduled appointments for a therapist and psychiatrist. *Id.* She did not keep those appointments. *See* R. 1207 (Aug. 2019). Ashley had also missed a week's worth of Depakote when she went to the ER with suicidal ideation on July 6, 2020. *See* R. 2875. She just "forgot" to take it, she said. *Id.* That summer, Ashley told several providers that she took her new psychotropic medications as prescribed, R. 2850; *see* R. 1806, and that they were "working," R. 1793, 1806, 1817. She also admitted that she "has had a lot of therapy but doesn't like therapy so doesn't stay." R. 1809 (Aug. 2020). Ashley does not "point to any specific piece of evidence not considered by the [ALJ] that might

have changed the outcome of [her] disability claim." *Reid*, 769 F.3d at 865 (emphasis omitted).

Accordingly, I find no error in the ALJ's failure to expressly discuss a closed period of disability

in this case. *See Ritchie*, 2021 WL 168443, at *3–4.

    2.    *Medical Opinions*

    Ashley's other arguments focus on the ALJ's analysis of medical opinions from Dr.

Bockner, Dr. Bullock, Ronald Kidd, Ph.D., and counselor Melvin Snead, LPC, LMFT. *See* Pl.'s

Br. 13–17 (citing R. 127–28, 957, 1102, 1239). "Medical opinions"—i.e., "statement[s] from a

medical source about what [the claimant] can still do despite" her MDIs and whether she has any

"impairment-related limitations or restrictions" in meeting specific demands of work, 20 C.F.R.

§§ 404.1513(a)(2), 416.913(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Oakes v.*

*Kijakazi*, 70 F.4th 207, 212–15 (4th Cir. 2023). The regulations specify "how [ALJs] consider

medical opinions" as part of their disability determinations and "how [ALJs] articulate" certain

findings in their written decisions. 20 C.F.R. §§ 404.1520c, 416.920c (claims filed on or after

March 27, 2017). First, ALJs "will not defer or give any specific evidentiary weight, including

controlling weight, to any medical opinion(s)" in the claimant's record. *Id.* §§ 404.1520c(a),

416.920c(a). Instead, ALJs "will consider [all] medical opinions . . . using the factors listed in

[subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.*; *see Oakes*, 70 F.4th at 212.

Second, ALJs "will articulate . . . how persuasive [they] find all of the medical opinions" in the

claimant's record. 20 C.F.R. §§ 404.1520c(b), 416.920c(b). These "articulation requirements" in

turn instruct ALJs to "articulate how [they] considered the medical opinions from [each] medical

source" on a source-by-source basis. *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). They "are not

required to articulate how [they] considered each medical opinion . . . from one medical source

individually." *Id.*

ALJs should "articulate how [they] considered the medical opinions . . . from [each] medical source together in a single analysis using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.* The "persuasiveness" factors include: "(1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like the physician's familiarity with the evidentiary record." *See Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(1)–(5)). The first two factors—supportability and consistency—"are the most important factors [ALJs] consider when [they] determine how persuasive [they] find a source's medical opinions . . . to be. Therefore, [ALJs] will explain how [they] considered the supportability and consistency factors for [each] medical source's medical opinions." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *see Cothran v. Kijakazi*, No. 21-2337, 2022 WL 5434323, at *1 (4th Cir. Oct. 7, 2022) (citing 20 C.F.R. § 404.1520c (2022)). They "may, but are not required to, explain how [they] considered the [other] factors" in determining how persuasive the source's medical opinions are to the disability determination. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The ALJ's decision must also build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes*, 70 F.4th at 214, is or is not "persuasive" evidence of the claimant's allegedly disabling medical condition(s), *see id.* at 212–13. When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of her conclusions," *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (quoting *Mascio*, 780 F.3d at 638), to ensure that "the ALJ's decision is supported as a matter of fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). Nonetheless, the plaintiff bears

the burden to explain why this Court should reverse or remand the Commissioner's denial of

benefits. *See* W.D. Va. Gen. R. 4(c)(1); *Reid*, 769 F.3d at 865.

    a.    *Relevant Evidence*

When Ashley applied for DIB and SSI in March 2018, she alleged that she was disabled

because of bipolar disorder, depression, anxiety, ADHD, and an unspecified learning disorder.

*See* R. 258. She had two panic attacks every day, R. 273, and she did not go out alone because

she would "freak out and think [she's] being followed," R. 276. *See also* R. 278. She could not

pay attention for very long, and she "shut down" or panicked in response to stress and changes in

her routine. R. 278–79. She got along "very well" with authority figures because she "listen[ed]"

to them. R. 279. She had never been fired or laid off because of problems getting along with

other people. *Id.* In April 2022, Ashley testified that she took care of her infant son and followed

a set schedule. *See* R. 1349. She did not have trouble starting chores or tasks around the house,

but she did "have trouble finishing them." R. 1356. She liked familiar routines. R. 1357. She did

not talk to people "very much." R. 1356.

In March 2018, Melvin Snead, LPC, LMFT, completed a one-page medical source

statement ("MSS") for Ashley. R. 957. He noted that Ashley had been diagnosed with bipolar

disorder (mixed episodes) and a personality disorder (borderline features) characterized by

numerous signs and symptoms including blunted or flat affect, disturbed mood, malaise, trouble

concentrating, persistent anxiety and anxiety attacks, impaired impulse control, and "poor

judgment @ this time." *Id.* Asked to rate Ashley's ability to do certain work-related tasks using a

five-point "Level of Impairment" scale ranging from "None" to "Extreme," Mr. Snead opined

that Ashley had "[m]oderate" impairment carrying out short/simple instructions, maintaining

concentration or focus, and getting along with the public, and "[m]arked" impairment getting

13

along with co-workers and supervisors, performing at a consistent pace, responding to changes in routine, and dealing with normal work stress. *Id.* The form does not define those ratings, and Mr. Snead did not explain why or how he chose them. *See id.* His therapy notes indicate that Ashley consistently reported or exhibited "low moderate" to "high moderate" problems[5] with anxiety, frustration level, and/or sadness, R. 963–69, 1010–15, which sometimes depended on the situation, *see* R. 964, 967–68. Aggression, anger, attention, concentration, impulsivity, and isolation typically were "not a concern" during their sessions. *See* R. 963–69, 1010–15, 1097. Mr. Snead's counseling focused on problem-solving skills and setting boundaries with family. *See generally* R. 963, 965–69, 1010, 1012–15.

Ashley saw Ronald Kidd, Ph.D., for a consultative psychological evaluation in early April 2019. R. 1099–1102. She was "generally cooperative" during both the mental status exam and intellectual testing portions of the evaluation. R. 1100. On exam, Dr. Kidd observed that Ashley's immediate recall and short-term memory were "intact," but her "attentional skills [were] mildly impaired." *Id.* Her performance on the Weschler Adult Intelligence Scale–Fourth Edition ("WAIS-IV") indicated "[b]orderline intellectual functioning" and possibly "a generalized auditory processing disorder. That is, [Ashley was] likely to have more difficulty with any auditory, verbal tasks than she [would with] visual-spatial tasks." R. 1101.

Dr. Kidd opined that Ashley could do a job involving "simple" and "routine, repetitive tasks that [were] primarily visual-motor in nature" as long as she could work "with little interference" from supervisors, co-workers, and customers. R. 1102. "The difficulties in her work [were] interpersonal, not liking to be around people and being suspicious of the intent of

---

[5] Mr. Snead used the following numerical scale to rate Ashley's "behavior and symptoms status" at each counseling session: "1 = resolved; 2 = mild; 3 = low moderate; 4 = high moderate; 5 = severe." R. 963–69, 1010–15 (punctuation added). Items left blank were "not a concern" at the time. *See id.*

14

others." *Id.*; *see* R. 1101 ("[H]er suicidal activity sounds manipulative and pouty. When she described her lack of social life, it is almost like she blamed her 'friends' for working too much, as if they should prefer being with her to working. She made a similarly superficial rationalization for her no longer working as a cashier at a fast food restaurant—'I don't like to be around people,' as if the world should revolve around her likes and dislikes."). "Hence, stressors on the job [were] the factor that would prevent [Ashley] from maintaining employment in a competitive setting." R. 1102. Dr. Kidd also noted that Ashley should find work within walking distance from her home because she did not have a driver's license. *See id.* Based on Ashley's own description of her "variable" sleep schedule, however, Dr. Kidd opined that "she might be unable even to walk to work reliably." *Id.*

Andrew Bockner, M.D., reviewed Ashley's record for DDS later that month. *See* R. 117–128, 132–43. He opined that Ashley's anxiety disorder and diagnosed "personality disorder, bipolar disorder, and borderline intellectual functioning" were "severe" MDIs that caused "moderate" limitations in her overall capacities to understand, remember, or apply information; to interact with others; and to concentrate, persist, or maintain pace, and a "mild" limitation in her overall capacity to adapt and manage herself. R. 124, 139. Dr. Bockner also completed a more detailed mental RFC form to "help determine [Ashley's] ability to sustain work activities." R. 127, 142. Ashley did not have any MDI-related functional limitations on her abilities to respond to stress, adapt to changes, set realistic goals, or manage her psychological symptoms in a work setting. R. 128, 143; *see* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(4). Her abilities to remember and follow very short simple instructions, to sustain an ordinary routine without special supervision, to make simple work-related decisions, and to maintain socially appropriate behavior were "not significantly limited." R. 128, 142–43. Ashley had "moderate[] limit[ations]"

remembering and following complex or detailed instructions, paying attention for "extended periods," completing work activities on a schedule without taking unreasonable breaks, getting to work on time and completing a normal workday and workweek without interruptions from psychologically based symptoms, interacting appropriately with the public, accepting instructions and criticism from supervisors, and getting along with coworkers without distracting them or exhibiting behavioral extremes. R. 127–28, 142–43. Dr. Bockner based these ratings on the WAIS-IV results indicating a full-scale IQ score in the "borderline range," Ashley's ability to take care of her activities of daily living, and evidence that she "is paranoid that someone will hurt her due to past trauma." *See id.*

Dr. Bockner's "actual mental [RFC] assessment is recorded in the narrative discussion(s)" below each broad work-related functional category, R. 128, 142, and in the "Additional Explanation" space after his paragraph B findings, *id.* (citing R. 124–25, 139–40). He opined that Ashley could "perform competitive work doing at least simple[,] unskilled tasks," sustain "attention and concentration for two hour periods in order to complete an 8 hour day," and "interact appropriately with supervisors and coworkers, but would be less comfortable in situations requiring frequent social contact with the public," and "would likely work best in a position that is well spaced with limited interactions with coworkers and the public." R. 128. He did not put any restrictions on her ability to deal with workplace stress. *See* R. 1319 (citing R. 128, 143).

In December 2019, Dr. Bullock completed the same one-page MSS that Mr. Snead filled out a year earlier. *See* R. 1239. He noted Ashley had been diagnosed with bipolar I disorder, panic disorder, generalized anxiety disorder, and insomnia. *Id.* Dr. Bullock checked off most of the same signs and symptoms that Mr. Snead had identified, but added delusional thinking,

paranoid thinking, and "profound irritability/self-doubt [and] self-loathing." *Id.* He opined that Ashley had "[m]arked" level of impairment carrying out short/simple instructions and getting along with supervisors, co-workers, or the public, and "[e]xtreme" level of impairment maintaining concentration/focus, performing at a consistent pace, responding to changes in routine, and dealing with normal work stress. *Id.* She would be absent from full-time work "4+ days/month" because of her "mental health problems." *Id.* Dr. Bullock's treatment notes show that Ashley always presented with "dysphoric, anxious" mood, "logical and goal directed" thought process, normal memory and cognition, "adequate to good" insight and judgment, and normal speech. R. 1247, 1250, 1253, 1256. She exhibited "no abnormal behaviors." *Id.*

    *b.*    *The ALJ's Decision*

The ALJ analyzed each source's medical opinion as part of her mental RFC assessment. *See* R. 1317–19; 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1). She found that Dr. Bockner's opinion was "generally persuasive and supported by his review of the evidence including personality disorder, bipolar disorder, depression, anxiety, and borderline intellectual functioning reducing [Ashley] to simple tasks with limited social interaction, as documented in his summaries." R. 1319; *see* R. 1314. Dr. Bockner's opinion was also "generally consistent with the longitudinal medical evidence of record given Dr. Bockner's analysis of no more than moderate limitations" understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. R. 1319 (citing R. 124, 139); *see* R. 1314. The ALJ rejected Dr. Bockner's opinion that Ashley had only "mild" limitations adapting and managing herself because "the evidence received at the hearing level depict[ed] even greater limitations" in that functional area. R. 1319; *see* R. 1313, 1315. In April 2022, for example, Ashley testified that she could "handle mental demands of parenting,

although it caused some stress. [She] had no problems with independently making plans and setting goals." R. 1313 (citing R. 1349–51). She also "testified that she could not maintain full[-]time employment" in part because "depression [and] anxiety" caused "difficulty handling new routines." R. 1315. The ALJ's RFC finding limits Ashley to working "in settings where tasks involve work primarily with objects rather than people" and dealing with only "occasional changes associated with simple, routine, repetitive work." R. 1314.

The ALJ found Dr. Kidd's medical opinion "partially persuasive and supportive [sic] to the extent" he concluded that Ashley could "sustain work carrying out simple, repetitive tasks with limited social interaction." R. 1318; *see* R. 1314. The rest of Dr. Kidd's opinion was "mainly based on [Ashley's] subjective complaints, overly restrictive, an overstatement of the evidence, and inconsistent with the longitudinal medical evidence, including" Dr. Bockner's assessment. R. 1319.

The ALJ found Mr. Snead's opinion indicating that Ashley had "marked limitations in a majority of functional areas due to bipolar disorder, panic disorder, and related symptoms" to be "unpersuasive, overly restrictive, and unsupported by his own clinical findings," specifically Mr. Snead's "handwritten checklist progress notes indicating mainly mild to moderate '2–4' and very few severe '5' findings" on exams and his failure to "account for [Ashley's] pattern of noncompliance" with mental-health treatment. R. 1317; *see* R. 963–69, 1010–15. Mr. Snead's opinion was also "inconsistent with the medical evidence of record including [Dr. Bockner's] assessment . . . which support[ed] no more than moderate limitations overall." R. 1317. The ALJ found Dr. Bullock's opinion that Ashley had "marked to extreme limitations in all functional areas due to bipolar disorder, panic disorder, generalized anxiety disorder, insomnia, and related symptoms" to be "unpersuasive, unsupportive [sic], overly restrictive, and an overstatement of

the evidence," R. 1319, but she did not cite any specific evidence. Dr. Bullock's opinion also

"did not account for [Ashley's] pattern of noncompliance" and was "inconsistent with" Dr.

Bockner's opinion identifying "no more than moderate limitations." *Id.*

      *c.*    *Discussion*

      Ashley challenges the ALJ's analysis of these medical opinions and her mental RFC

determination on two grounds. *See* Pl.'s Br. 13–15 (discussing Dr. Bockner's reviewing-source

medical opinion), 15–17 (discussing treating- and examining-source medical opinions). First, she

argues that the ALJ's RFC finding is actually "more restrictive" than Dr. Bockner's "opinion

findings," even though the ALJ's persuasion analysis "gave every impression that she was in

agreement with all of [those] opinion findings." *Id.* at 14 (citing R. 1314, 1319). Specifically, Dr.

Bockner "found 'moderate' impairment . . . with respect to maintaining regular attendance,

performing activities within a schedule," being on time for work and completing a normal

workday and workweek, performing at a consistent pace without taking unreasonable breaks,

"and accepting instructions and respond[ing] appropriately to criticism from supervisors." *Id.*

(emphasis omitted) (citing R. 127–28, 142–43). Yet, "no RFC limitations were given [by the

ALJ] as to dealing with supervisors[,] let alone absenteeism or punctuality." *Id.* (citing R. 1314).

Ashley asserts that the ALJ was required to explain why she ostensibly disagreed with Dr.

Bockner's "opinion findings" on those points. *See id.* at 13–15.

      This argument focuses on Dr. Bockner's statements about Ashley's overall limitations in

broad work-related categories, while ignoring his "actual mental [RFC] assessment . . . recorded

in the narrative discussion(s) . . . following each [broad] category of limitation," R. 127, 143.

Both statements are medical opinions under the regulations, 20 C.F.R. §§ 404.1513(a)(2),

416.913(a)(2), and the ALJ was not required to articulate how she considered each opinion

individually, *id.* §§ 404.1520c(b)(1), 416.920c(b)(1). Dr. Bockner also opined that, while Ashley

was "moderately limited" in some work activities involving staying on schedule and interacting

with other people, she would still "be able to perform competitive work doing at least simple[,]

unskilled tasks"; sustain "attention and concentration for two hour periods in order to complete

an 8 hour day"; and "interact appropriately with supervisors and coworkers, but [she] would . . .

likely work best in a position that is well spaced with limited interactions with coworkers and the

public." R. 128, 143. He did not restrict Ashley's workplace attendance, interaction with

supervisors, or abilities to deal with workplace stress or adapt to change. *See id.*

The ALJ's mental RFC determination tracks Dr. Bockner's medical opinions by limiting

Ashley to sustained full-time work involving "simple[,] routine[,] repetitive tasks for two hours

at a time with normal breaks" and only "occasional contact with co-workers[,] but none with the

public," as long as she can be "in settings where tasks involve work primarily with objects rather

than people." R. 1314; *see Sizemore v. Berryhill*, 878 F.3d 72, 80–81 (4th Cir. 2017). The ALJ's

RFC analysis makes clear that she did not limit Ashley's interaction with supervisors—as

opposed to coworkers and the public—because Dr. Bockner's "persuasive" opinion contained no

such restriction and she rejected Mr. Snead's and Dr. Bullock's opinions that Ashley had

"marked" problems getting along with supervisors. *See* R. 1317–19 (citing R. 128, 143, 957,

1239); *cf. Boggs v. Kijakazi*, No. 22-2140, 2023 WL 4787446, at *1 (4th Cir. July 27, 2023)

("We conclude that the ALJ applied the correct legal standards in evaluating Boggs' claim—

particularly in terms of analyzing the supportability and consistency of [a] significant

manipulative restriction advanced" in treating source's medical opinion (citing 20 C.F.R. §

404.1520c)); *Sawyer v. Astrue*, No. 775 F. Supp. 2d 829, 836 (E.D.N.C. 2011) ("Where the

record does not contain medical evidence with respect to a particular limitation, the ALJ is

correct to find no limitation."). The ALJ also rejected Dr. Kidd's opinion that "'stressors'"

caused by "'a nosy supervisor'" might "'prevent [Ashley] from maintaining employment in a

competitive setting," R. 1318 (quoting R. 1102), because it was "mainly based on [Ashley's]

subjective complaints" rather than objective medical evidence, R. 1319; *see* 20 C.F.R. §§

404.1520c(b)(1), 416.920c(b)(1), and it was inconsistent with Dr. Bockner's medical opinion

based on Ashley's treatment records, R. 1319; *see* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Instead, the ALJ limited Ashley to dealing with only "occasional changes associated with simple,

routine, repetitive work," R. 1314, which is more restrictive than Dr. Bockner's opinion that

Ashley had no "adaptation limitations" at all, R. 128, 143. *Cf.* SSR 83-10, 1983 WL 31251, at *5

(Jan. 1, 1983) ("'Occasional[]' means occurring from very little to up to one-third of the time"

and "should generally total no more than about 2 hours of an 8-hour workday.").

Second, Ashley raises a general objection to "the ALJ's rejection of medical opinions

[from] Dr. Kidd, Dr. Bullock, and LMFT Snead." Pl.'s Br. 17; *see generally id.* at 14–17 (noting

Ashley's history of hospital admissions and emergency room visits). She does not challenge the

ALJ's actual reasons for finding Mr. Snead's, Dr. Bullock's, and the more restrictive aspects of

Dr. Kidd's medical opinions to be "unpersuasive" under 20 C.F.R. §§ 404.1520c, 416.920c, or

for adopting Dr. Bockner's medical opinion. *See id.* at 14–16. On the contrary, she concedes that

"there may be some dispute . . . as to the first and second prongs of 20 C.F.R. § 404.1520c,

which are about the 'supportability' and 'consistency' of the [source's] medical opinion with the

medical evidence of record." *Id.* at 16. It is the ALJ's responsibility to resolve conflicts in the

evidentiary record and to explain how persuasive she found each source's medical opinion to be

considering the relevant factors. *Cothran*, 2022 WL 5434232, at *1 (applying 20 C.F.R. §

404.1520c); *see also Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015). A reviewing court

"must defer" to the ALJ's evaluations of conflicting medical opinions "unless they are not supported by substantial evidence," *Dunn* 607 F. App'x at 271. *See Cothran*, 2022 WL 5434232, at *1. The ALJ's explanation in this case, albeit somewhat sparse, shows that she applied the correct legal standard by analyzing the supportability and consistency factors for each source's medical opinion, 20 C.F.R. §§ 404.1520c(b), 416.920c(b), and that her decision is supported by substantial evidence. *See Cothran*, 2022 WL 5434232, at *1.

Ashley does not argue otherwise. *See* Pl.'s Br. 15–17. To the extent Ashley makes any argument on this point, she asserts only that the ALJ's "decision-making" was "undercut by the fact that she inaccurately" characterized Ashley's severe mental MDIs as "merely 'depression'" and "merely 'anxiety,'" when in fact Ashley had been diagnosed with "bipolar disorder with psychotic features," a panic disorder, and generalized anxiety disorder. *Id.* at 17 (emphasis and citations omitted). "However, medical conditions alone do not entitle a claimant to disability benefits; 'there must be a showing of related functional loss.'" *Felton-Miller*, 459 F. App'x at 229–30 (quoting *Gross*, 785 F.2d at 1166) (brackets omitted)). Ashley's diagnoses themselves "do[] not establish that she suffers from any particular symptoms or limitations." *Id.*

Moreover, the ALJ referenced these diagnoses several times in her decision, R. 1311, 1317, 1319, and found that Ashley's severe depressive disorder and anxiety disorder, R. 1310, 1317, could reasonably be expected to cause allegedly disabling mania, mood swings, impulsive behavior, persistent anxiety, paranoia, panic attacks, isolation, and recurrent suicidal ideation, among other symptoms, *see* R. 1315, 1318, 1320. She gave specific reasons, supported by citations to relevant evidence, to support her finding that "the degree of limitation alleged [was] not supported by the record." R. 1320–21 (citing R. 1099–1100, 1035, 1095, 1207, 1264, 1508–28); *see Roddy*, 2022 WL 855519, at *8–9. The ALJ also explained why Ashley's "significant

mental-health issues," R. 1320, did not prevent her from sustaining "simple, repetitive, routine [work] tasks with limited social interaction," R. 1318. *See* R. 1319–21. Ashley does not challenge the ALJ's specific findings or conclusions on those points. *See* Pl.'s Br. 14–17. Furthermore, the ALJ considered the evidence of Ashley's hospital admissions and emergency room visits. R. 1315–17. The ALJ found that additional medical and other evidence showed that Ashley was not as limited as she claimed or as Mr. Snead, Dr. Bullock, and Dr. Kidd assessed. The medical record showed mixed psychiatric signs, but improvement and stability when Ashley was compliant with her medications and attended therapy. R. 1320. The ALJ found that Ashley's activities of daily living, including caring for her young child, generally good relationship with family, and ability to do housework, showed only mild restriction. R. 1321. As discussed above, the ALJ gave adequate reasons for relying, to a large extent, on Dr. Bockner's medical opinion in assessing Ashley's RFC. Accordingly, I find that substantial evidence supports the ALJ's assessment of the medical opinions.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 18; **AFFIRM** the Commissioner's final decision denying Ashley's DIB and SSI claims; and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: January 25, 2024

Joel C. Hoppe
United States Magistrate Judge